May it please the Court. As the Court knows, this is an appeal from a jury for the defense of a medical malpractice case, more specifically an orthopedic surgical malpractice case. It is undisputed in this case that the surgery that was actually performed at the time of surgery was not determined pre-operatively. The defense concedes that the doctor asked my client Kevin Kahrig to sign a consent for a left knee arthroscopy and proceed as indicated at surgery. Therefore, it was the defendant physician's plan to see what he would see at the time of surgery and whether and what surgical indications were present. And that's what the plaintiff consented to? Absolutely. You don't make any claim about lack of informed consent? We do not. We do not. The claim in this case in that regard is that at the time of surgery, the surgical indications that the defendant physician believed justified the procedure that he did, did not justify the procedure that he did. And there was conflicting expert testimony on that issue? There was not, Your Honor, respectfully, and may I elaborate on that point? Please do. That's pretty much, I think, where we're standing. I am standing here. There were two indications according to Dr. Penn for performing the lateral release of the tendon in this case. The first one was a cartilage blister that he claimed was significant. He didn't put it in his operative report, but he testified it was significant. Okay, moving on from there. The defense argues in their brief, and the doctor so testified, I'm referring to page 35 of the doctor's brief on appeal, that two things coupled together constituted surgical indications for this lateral release. One, the plaintiff's expert said, you cannot, under the standard of care, measure patellar tilt with a tourniquet up. Now, the doctor testified about the blister, the cord, that's all in the briefs. Let me talk about the patellar tilt, because that's what I think this really boils down to in terms of surgical indications. The plaintiff's expert said, you cannot, under the standard of care, measure patellar tilt with a tourniquet up. Cannot do it under the standard of care. The defense expert, Dr. Ritchie, said, well, I don't think the issue of the tourniquet up or down has been discussed in terms of the standard of care. So, according to Dr. Ritchie, he didn't think there was a standard of care on the surgical tourniquet up or down. But, he said, he never has the tourniquet up when he's measuring patellar tilt. Never. That was his testimony. For patellar tilt, I don't use a tourniquet. So, yes, it's never up. So, the testimony on measuring patellar tilt with a tourniquet is, the plaintiff's expert says you can't do it. The defense expert says, I don't do it. I don't think there's a standard of care on it. I don't do it. And the physician, the defendant physician said, I disagree with both of the experts. So, he was testifying for himself, but as an expert. Yes, but I'm standing before this court suggesting that under the manifest way to the evidence doctrine, that when both the plaintiff expert and the defendant expert, in a malpractice case, say the doctor shouldn't have done what he did. One saying that it's a standard of care issue. The second saying, well, I don't think there is a standard of care on it. But, I never do it that way. Isn't the jury free to reject both so-called independent experts and believe the defendant physician? I don't think in this context, Your Honor, for a defendant physician to say, well, I disagree. I think it's okay to do it. Based on what? He testified extensively that his procedure is based on Dr. Insull's articles and literature. And that literature doesn't say anywhere that you should be measuring patellar tilt intraoperatively at the time of surgery with a tourniquet on. And to determine whether the tendon around the patella is too tight. So, you have a tourniquet on and you're determining tightness with a tourniquet on. So, I think for this court, I've tried 30 of these medical malpractice cases. I've never seen the plaintiff's expert and the defense expert agree on very much. And I think when you have something like this, was there a surgical indication to do that which was done? To put a defense expert out there and say, I don't do what the defendant did on whose behalf I'm testifying. The only evidence in this case that this is appropriate is the defendant himself saying, well, I say what I did is appropriate based on nothing. So, I would concede that normally, as counsel says in his brief, normally for an expert to say, well, I don't do it that way, that doesn't cut very much in terms of the standard of care. But this is a unique case for this reason. Number one, the person who said that says there is no standard of care on this point. So, he's saying I don't think there's a standard of care, but I can tell you I don't do it. And the plaintiff's expert is saying there is a standard of care and it wasn't followed. So, what we're arguing, Your Honor, is, Your Honors, I apologize, I don't mean to limit this to one justice. What we're arguing is under the manifest way of the evidence statement where the plaintiff's expert and the defense expert say the doctor should not have done what he did. In terms of measuring surgical indications based on a tourniquet, measuring tightness with a tourniquet on, that the doctor's testimony by itself is contrary to the manifest way of the evidence to put it bluntly. And in view of that position, I mean, after all, the defense expert says there's a 69% chance of a false positive in terms of the tilting of the patella if you leave the tourniquet. 69% is more likely than not. And so, on this record, in this testimony, those two experts should trump the doctor, of course, defending himself. And it should really trump, in terms of reversal, in view of the fact that the defendant's trial counsel chose to end this cross-examination of my client by asking my client, well, if you lost all this money, how could you buy a $300,000 boat? Not how could you buy a boat. How could you buy a $300,000 boat? Now, the cases we cite, I'm certain the Court's read the briefs of the cases, but I just want to emphasize that we believe the test set forth in this Lorenz decision, which talks about whether the evidence of liability is close enough to sustain a Verdi 3 department. And however the Court comes out and manifests way the evidence, I don't think it could be said on the issue of whether there's a deviation to find a surgical indication in this patella typus using a tourniquet. Surely, the testimony on that deviation would be sufficient to sustain a verdict for the plaintiff had the jury determined a verdict for the plaintiff. So the issue for the Court, as far as the plaintiff is concerned, is can it be determined from the record, given that the evidence was, at the very least, arguendo, close enough to sustain a verdict for each department. Can it be determined from this record whether this appeal to the financial ability of Kevin Kaling to buy a $300,000 boat affected the jury verdict in terms of passion, prejudice, and sentiment? The plaintiff objected to the question. The objection was sustained, correct? It sure was. And no request to further instruct the jury? As far as the Court knows, I was in trial counsel and I'm told that the trial counsel was a very able lawyer. I'm not standing here criticizing him. Yeah, no, I'm just asking what does the record reflect? There was no request and also no motion for mistrial at the time. The record reflects both of those things in all candid. However, as the Lorenz Court points out, the fact that the objections were sustained and the questions were never answered is of small consolation. The very asking of questions directed the jury's attention to the non-issue and achieved the intended inflammatory result. I mean, once, twelve, maybe, here, that this man bought a $300,000 boat, which is out of the reach of most people. I don't know how you would erase that with anything. Were there any instructions given to the jury, written instructions, during the instructions conference about, to the effect of the wealth of either party has nothing to do with this case or anything like that? I know the Court gave IPI 101 that you shouldn't consider sympathy, passion, prejudice, but I don't remember that off the top of my head, that one containing wealth. If it does, it does. I want to be candid with the Court. But, having tried these cases myself, I think that I don't understand, nor does the defense explain in their brief, why the question was asked at all. Well, clearly it shouldn't have been asked. And an objection was made and it was sustained. Which gets into the issue of his website, which counsel says I'm violating the rules of the Court by attaching the website of defense counsel to the brief. I don't mean this to be facetious or sarcastic, but had Mr. Pierce written a law review article on his experience of trying this case and said what he said on his website, there's no doubt I could cite those law review articles, not as evidence of the case, it's not evidence of anything, it's a window into counsel's mind. I am offering this to show that counsel viewed this as a closed case. Indeed, he argued in response to the post-trial motion that the evidence was conflicting, which is exactly what the standard is in Ms. Loren's case. If the evidence is conflicting, how can an inflammatory question like that stand? So, I want to be clear while I'm offering this. Counsel believes that he tried a case where his expert disagreed with his client. Which he views, rightly so, as a medical malpractice attorney, as a difficult situation. And so I'm saying, why does a lawyer ask a question like that, if not to make sure that in a difficult situation, the jury doesn't ruin the favor of the other side? I think the question, and Mr. Pierce is a nice man, I'm arguing as a lawyer, I'm not impugning his character, but I'm suggesting that that question was asked for a purpose and this Court should not countenance that. Yes, there was an objection. Yes, the judge said it was ridiculous. I submit it was more than ridiculous. It was designed to tell the jury that Kevin Kary didn't need any monetary verdict that the jury might award. That whatever his complaints were, he's got money. And to suggest, as the defense does, in their brief. Let me ask this question. I haven't looked at the record yet. Is there anything in the record one way or another as to whether or not the plaintiff actually did buy a $300,000 boat? No. In other words, the question is, was there any good faith basis for whether or not the facts were true when the question was asked? Well, does the record reflect either way? The answer is no, it doesn't, which is why we have the last section of our brief on incomplete impeachment, where you sort of just throw something out there. Obviously, the Court didn't give trial counsel for the defense the chance to complete the impeachment. I think it would have been collateral and immaterial in any way, but be that as it may. It just seems to me, had he said, did you buy a boat? That would be bad. Objection sustained. Okay, did you buy a boat? Did you buy a $300,000 boat? Says, this guy's got money. And I think the Court should, will consider this in the context in which it's set. The defense argues, well, that's the only incident, that's the only time this happened. It was a one-shot deal. I'm not sure you need a second shot when that's the one shot. If you're trying to make the point this guy doesn't need the verdict the jury could award, that makes the point. Furthermore, I think if you take this the other way, if plaintiff's counsel had said to the doctor, Well, doctor, the jury doesn't need to worry about finding monetary damage. You have insurance, don't you? Or just, you have insurance in case the jury votes against you. I don't think you need two or three or four or five or six instances of that. I'm sure if the plaintiff got a verdict, if the plaintiff's trial counsel did that, that this Court would speak to whether the verdict would stand. So the line of cases that are cited here, that will usually, Illinois courts, have multiple instances of this. Okay, let's assume that's true. Usually they do. There's no hard and fast rule that there has to be more than one inflammatory event to overturn a verdict on this case. So, all of this is set in the context of this case, where you have a doctor who says, I'm going to determine at surgery what I'm going to do. I felt that the blister plus the tightness of the patella tendon was an indication for the release. But he had a tourniquet on while he was measuring that tightness, which both the plaintiff's expert and the defense expert say should never, in the words of Dr. Ritchie, the defense expert, I want to make sure I say it correctly. For patella tilt, I don't use a tourniquet, so yes, it's never up. This was a case where a defense expert is saying what the doctor did that he's defending, he wouldn't do, and in his view, the tourniquet's never up like this doctor had when you're measuring tightness, especially since there was no workup for tightness preoperatively. So in a case like that, throw that boat comment out. Respectfully, Your Honors, I think that was reversible error. And I think the status of the expert testimony showed that whatever Dr. Penn had to say about his own procedure was contrary to the manifest weight of the expert evidence of the other two experts. Thank you. Thank you, Counsel. Counsel. Please be seated. May it please the Court, Your Honors. My name is William Hardy. I represent the defendant, Apolline, Southwest Orthopedics, and Dr. Penn. Counsel. Let me go to the very first point that you raised. Mr. Nathanson says that it's basically undisputed that our expert, Dr. Ritchie, said you never use a tourniquet when assessing patellar tilt. Well, I'm sure that you've read my brief, and he talked about him practicing law for 30 years and never seeing this situation before. I have many opinions, and experts disagree all the time. But this expert didn't disagree. He didn't say that there was some violation of the standard of care. All Dr. Ritchie said was that he doesn't use tourniquets during his surgery. He didn't say that that was a violation of the standard of care. In fact, he said very clearly that there is a distinction between patellar tilt and patellar tracking, and that's the whole red herring here. I mean, in the closing arguments, you'll see that there's this argument back and forth about patellar tilt versus patellar tracking. And there's a huge difference between the two. It's testified to by both Dr. Ritchie and by Dr. Penn, and also, incidentally, I think, by implication by Dr. Somanyi. Their expert, Dr. Somanyi, testified that there's three situations where you might want to consider this type of an operation, and only one involves a situation where you do a lateral release. You have to have some cartilage damage, and you have to have patellar tilt. He talks about all these articles. Well, these articles deal with, for the most part, total knee replacements, total knee replacements where Dr. Somanyi is talking about the total knee replacement situation. I put everything together, and then there have been occasions where I'll release the tourniquet, and, you know, there's obviously a false positive because it's dealing with tracking, and that's what he is dealing with when he's giving those opinions, and that's what those articles deal with. As both Dr. Ritchie and Dr. Penn testified in some detail, there's a significant difference between the two. And for patellar tilt, which is a pressure situation, it's not a dynamic problem that deals with tracking, moving the kneecap through the great groove. It's a pressure situation. The testimony is that there is no effect from the tourniquet. There's absolutely nothing wrong with doing that. Now, what he's referring to there with that one line of cross-examination is a very isolated portion of Dr. Ritchie's testimony. And, you know, I have to say that in 20 years of practice, I have never, and I don't want to get into any personal attacks either. I'm just going to concentrate on the brief. I have never had to write a statement of facts like I did in this case. The statement of facts in the plaintiff's brief is the most biased one-sided statement of facts I have ever read in my life. It totally disregards all of the evidence in favor of Dr. Penn, and it portrays the evidence in the light most favorable to the plaintiff, which is exactly the opposite of the standard that this Court is required to review the case under. Dr. Simone was subjected to intense cross-examination on a number of his opinions. And I suggest to you when you read the statement of facts and the portions of the record relating to that, you'll see that Dr. Simone, who supposedly is the only one who testified to this standard of care, is the doctor who basically tailored the facts to fit his opinions. The facts that didn't fit his opinions, he completely disregarded. And we go through those in our brief, so I won't get into them in any significant detail. But I will say that you can't just take that isolated testimony. You know, this cartilage blister is clearly shown on the interoperative pictures. Dr. Ritchie said that everything he did was within the standard of care. When he was talking about the tourniquet, again, he was talking only about what he does. And we point out in our brief, we cite all the cases. Mr. Nathanson didn't file a reply brief. We cite all the cases that say, look, it doesn't matter. You may have an expert who disagrees and occasionally says, sure, that's not the way I do it. But that doesn't mean that it's a violation of the standard of care. I mean, we all know that doctors have different approaches to surgeons. And, you know, when you read their brief, they present this as if it had to have been done preoperatively. Well, they don't consider the totality of the circumstances here. What happened was Dr. Penn started with conservative treatment. He did an EMG. He did an MRI. He tried injections. None of that worked. The plaintiff presented with all these symptoms of pain, which they want to say simply didn't occur, even though it's in the plaintiff's own self-history. After all of that, all of those tests and the conservative treatment didn't resolve his problems, they went in for a diagnostic surgery, which our expert says is a definitive diagnostic tool. He went in. He found the thickened plica. He cleaned that out. There was a cartilage blister there. He found the teller tilt. He performed the surgery. Dr. Tessier, a treating physician, testified that based on his review of this, that's a pretty standard operation. It's a pretty standard procedure based on those kinds of symptoms. And, you know, one thing that he didn't respond to in our brief, which I think is a waver. He hasn't filed a reply. You know, we also argued that there's an alternative route for affirming it, and that is the issue of proximate cause. What do we know from this record? We view the evidence in the light most favorable to the defendant as required. What you see is that the plaintiff was doing well after this surgery. Now, they present the evidence a different way. Mr. Keith, who's a very fine attorney, probably the best plaintiff's attorney in Madison County, he tried to attack those facts because they didn't fit into what his expert was saying. But we know from the physical therapy notes and Dr. Penn's notes that he basically improved. Dr. Penn says in six weeks post-op he was where he should have been for this operation. He's released at that point. He's supposed to come back later. What does the plaintiff do? He goes to see Dr. Leeman. Dr. Leeman performs a surgery to undo that operation that Dr. Penn performed. Three months post-op, plaintiff's expert, Dr. Somadi, says, Well, it takes a minimum of six to 12 months to recuperate. I don't know what the jury determined here, but the jury may very well have determined that, look, he would have been fine. He would have continued to improve. But, you know, that is an issue. That's an alternative ground that plaintiff has not addressed, and I think very clearly warrants affirming. And I would just urge you not to review just that one quote. You know, in our brief we point out all of the substantial testimonies from Dr. Ritchie and Dr. Penn and even Dr. Somadi, the inconsistent testimony about Dr. Somadi. I won't get into the pre-op and, you know, cutting the muscle and so forth because he didn't get into that, but I do want to go to the alleged error. Now, the Lorenz case. The Lorenz case involved multiple errors. We discussed that case in our brief. It involved multiple errors, an opening statement, closing argument during the trial itself, as did the other two cases that the plaintiff relies on, the Green case, and I can't remember the name of the other case at this point. But we cited a number of cases which indicated subsequent to that time, other courts have distinguished those cases and said, look, if you have a single error, and, Judge, you know, I will, the vote itself I think is relevant. There's no question about it. The $300,000, I don't think I would have brought that up, and in the heat of the moment sometimes attorneys, you know, bring up these things. I don't think that is in any way reversible error. The judge immediately sustained the objection. He said it was ridiculous. The issue goes to damages, if anything, the jury found in favor of the defendant on liability. If anything, it's harmless. As far as the way the plaintiff presents the argument, you know, what I think is interesting here is as an appellate practitioner, I've always been taught, you raise your strongest argument first, your second strongest argument last, and you throw everything else in the middle. Well, if you look at the way their brief was designed, manifest weight is first, and in the middle they've got this argument about this one comment that Mr. Pierce made, and then they go on to argue about this impeachment, which, quite frankly, I have a little difficulty understanding. The cases involving failure to link up or failure to follow up on impeachment, the cases that they cite, one of them, for example, involves a situation where a guy was in a wheelchair, and the attorney kept asking, well, would it surprise you if the guy was seen walking? Would it surprise you if he was seen, you know, getting out of his wheelchair and doing these activities? And when there was an objection to that at trial, the attorney said, well, I'm going to link that up later on. Well, he never did link it up. So, you know, he goes through this long series of questions that implies all these things to the jury, and he never links it up after he says he's going to do it. That's completely different than what we have here. Those are circumstances where the initial question was relevant to something in the case to begin with, right? I would agree. Whereas whether or not he purchased a $300,000 boat was never relevant. Well, I think the fact that he purchased a boat is certainly relevant. Well, if you're going to go on and say if you have all these injuries, how do you get in the boat, how do you get it out in the water and so forth and so on, but, I mean, the way the question, the series of questions leading up to that, the money part of it just kind of comes out of the blue, doesn't it? Well, again, I think in the heat of the moment, attorneys sometimes say things that they don't necessarily intend to say. I will say this about the record in this case, and I'm sure you will review it all. Almost every ruling went in favor of Mr. Keeton. You know, there are this, he objected to this. It was pretty routine. It's the only issue that was raised in the post-trial motion. All these other things have been pointed out, the impeachment. There you can link up impeachment and improper impeachment. Not only was that not objected to at trial, and, you know, you raise the point, well, was there, you know, was it true? Was there any evidence? And, of course, it was never linked up later on because the objection was sustained, and no one ever asked to link it up. Well, of course, it would be more egregious if it wasn't true at all, if it was just a made-up question, right? Right. And I think, you know, I'd have to double-check the record on this, but, you know, the notion that this guy had money I think was in the record. The very tax returns admitted by the plaintiff, you know, I think showed a brokerage statement at some point showing how much money he had in the bank. I mean, it wasn't really hidden. And these other things that he refers to, that Mr. Nathanson refers to, the condo, the fact that he got married, his child, that was all brought up on direct. And, you know, Mr. Pierce did stipulate that the average for lost wages was X number of hours over several years, but he certainly never stipulated that they were approximately caused by the accident. You know, this guy got married. He had a child. He bought a condo in the Ozarks, which was all brought up in direct. He was spending more time there. You know, that's certainly a reasonable explanation for not making as much money. And, you know, Mr. Pierce started out with the tax returns by pointing out that he actually made more money in the year following this surgery. So, I mean, that was all testified to without objection or both direct and cross by both sides. So the notion that that somehow supports reversal in this case I think is just completely out of left field somewhere. And it's obviously waived because it wasn't raised in the post-trial motion. So unless the court has any questions, I think that I have thoroughly discussed all the other issues in my appellate brief. I don't believe we do. Thank you, Your Honor. Thank you, Your Honor. Counsel? The last point the counsel made, the trial counsel put in his post-trial motion the asking of the question on the $300,000 bond. He didn't argue it in terms of incomplete impeachment, which Your Honor asked me, but that is one of the errors in the post-trial motion. That it was inflammatory and et cetera. I want to talk about this red herring that counsel is talking about, tracking, the tracking patella versus the tilt of the patella. Tracking with a kneecap, does it track, does it articulate up and down like it's supposed to as opposed to sideways. The tilt is the way it's sitting. There is no red herring in this case whatsoever regarding tracking versus tilt. And the defense expert made this very clear when he was asked by Plano's counsel whether the standard of care requires the tourniquet down to track, to determine the patella tracking and tilt. And he said for patella tracking, most definitely, for patella tilt, I don't use a tourniquet. So yes, it's never up. So he spoke to both the tracking and the tilt. There is no red herring. It's not limited. Assessing this intraoperatively is not limited to one or the other. Counsel said that they have a proximate cause argument. And who knows what the jury did. Well, the defense never tendered a special interrogatory asking the jury whether there was proximate cause or not. So counsel speculated and appealed that maybe there was a proximate cause in this general verdict. But as we cite on page 8 of our brief, Dr. Ritchie, the defense expert, candidly admitted that because Dr. Penn used the tourniquet, and because he performed a lateral release without preoperative indications, he could well have performed a surgery that was not necessary. Because the tourniquet could have been a false positive for tightness in the patella and the patellar tendon. So when the defense expert says it could well have been an unnecessary surgery, I don't understand how the defendants are arguing proximate cause. To sum all this up, and I certainly don't want the court to think that this is only about $300,000 boats, the plaintiff's expert and the defense expert said you can't measure patellar tightness with a tourniquet up. The medical literature they cited said the same. Dr. Penn, that's discussed at page 11 of our brief, Dr. Penn disagreed with both experts, including the one obtained to defend him, and the literature on the point. Therefore, is the plaintiff's position that since under the IPAD instructions the jury is told, as the court knows, you have to prove one or more deviations from the standard of care that was approximate cause. There are multiple deviations in this case that are assessed preoperatively, surgical error in terms of cutting muscles and tendons, but all the plaintiff's burden is one or more. And on that one deviation, I'm resting on a brief for the court to evaluate the rest of it. I don't want to be understood as waiving anything in my brief. But on that deviation, the verdict is contrary to the manifest way to the evidence. I'm unaware of any case that says a defendant doctor, by himself or herself, can sustain a verdict in his or her favor where the expert witnesses on both sides don't agree with what the doctor did. And that's really what this case boils down to. I would ask the court to reverse this judgment for that and the other reasons stated in our brief, and I would thank the court for its consideration. Thank you, counsel. We appreciate the briefs and arguments of all counsel, both counsel, and we'll take the case.